**United States District Court**
**Northern District of Texas**
**Amarillo Division**

THE STATE OF TEXAS,
By and through its Attorney General,
Ken Paxton

THE STATE OF ALABAMA,
By and through its Attorney General,
Steve Marshall

THE STATE OF ALASKA,
By and through its Attorney General,
Treg R. Taylor

THE STATE OF ARIZONA,
By and through its Attorney General,
Mark Brnovich

THE STATE OF ARKANSAS,
By and through its Attorney General,
Leslie Rutledge

THE STATE OF FLORIDA,
By and through its Attorney General,
Ashley Moody

THE STATE OF IDAHO,
By and through its Attorney General,
Lawrence Wasden

THE STATE OF INDIANA,
By and through its Attorney General,
Todd Rokita

THE STATE OF KENTUCKY,
By and through its Attorney General,
Daniel Cameron

**Civil Action No. 2:22-cv-00014**

THE STATE OF LOUISIANA,
By and through its Attorney General,
Jeff Landry

THE STATE OF MISSOURI,
By and through its Attorney General,
Eric Schmitt

THE STATE OF MONTANA,
By and through its Attorney General,
Austin Knudsen

THE STATE OF OKLAHOMA,
By and through its Attorney General,
John M. O'Connor

THE STATE OF SOUTH CAROLINA,
By and through its Attorney General,
Alan Wilson

THE STATE OF UTAH,
By and through its Attorney General,
Sean Reyes

*Plaintiffs*

v.

JOSEPH R. BIDEN, JR., in his official
   capacity as President of the
   United States,

UNITED STATES OF AMERICA,

ANTONY J. BLINKEN, in his official
capacity as Secretary of State,

U.S. DEPARTMENT OF STATE,

NANCY IZZO JACKSON, in her official
capacity as Senior Bureau Official, Bureau
of Population, Refugees, and Migration,

U.S. DEPARTMENT OF STATE, BUREAU OF
POPULATION, REFUGEES, AND
MIGRATION,

ALEJANDRO MAYORKAS, in his official
capacity as Secretary of Homeland
Security,

U.S. DEPARTMENT OF HOMELAND
SECURITY,

UR JADDOU, in her official capacity as
   Director of U.S. Citizenship and
   Immigration Services,

U.S. CITIZENSHIP AND IMMIGRATION
SERVICES,

*Defendants*

## AMENDED COMPLAINT

The States of Texas, Alabama, Alaska, Arizona, Arkansas, Florida, Idaho,
Indiana, Kentucky, Louisiana, Missouri, Montana, Oklahoma, South Carolina, and
Utah (collectively "Plaintiff States") bring this civil action against the above-listed
Defendants for declaratory and injunctive relief and allege as follows:

### INTRODUCTION

1.      Aliens who are qualifying relatives of American citizens or lawful
permanent residents often wait years—or decades—to lawfully immigrate to the
United States. They endure lengthy processes, background checks, and paperwork

requirements that can seem substantial. But they go through the process that Congress created, and they patiently wait for their opportunity to lawfully enter the United States and pursue the American dream.

2.     Conversely, illegal aliens do not have the right under federal law to petition the federal government for their relatives abroad to join them in residing in the United States. There are no lawful paths for aliens who lack status to come join other aliens who lack status in the United States—and for good reason. It defies common sense. No sovereign nation would reward those who break the law by permitting family members abroad to join them in living in the sovereign territory unlawfully, particularly with the assistance of the government itself. To do so would undermine national sovereignty and would be fundamentally unfair to those who pursue lawful immigration channels and patiently wait for their opportunity to immigrate to the United States.

3.     But the Biden Administration has created such a program for certain illegal aliens who are from El Salvador, Guatemala, or Honduras (the region known as the Northern Triangle) and who reside in the United States, so long as they meet certain arbitrary qualifications created by the Administration. In short, if an illegal alien from one of those three countries is inside the United States and has so much as a *pending* application for asylum, they can petition the United States Government to bring their minor children into the United States—despite no explicit authority from Congress to do so. And not just the illegal alien's minor children, but also the

4

in-country parent of a qualifying child, a legal guardian, or a child's primary caregiver.

4.     In fact, beneficiaries under this extra-statutory regime—innocuously named the "Central American Minors Program," or "CAM"—are permitted to enter and reside within the United States for a practically indefinite period.

5.     The CAM Program is an inartful combination of two different statutory authorities in the immigration laws: the Refugee Admissions Program under 8 U.S.C. § 1157, and the "parole" authority under 8 U.S.C. § 1182(d)(5)(A).

6.     The United States first screens aliens for eligibility for the Refugee Admissions Program, but most of the applicants do not come close to meeting the legal standard to be considered a "refugee" as it is defined in 8 U.S.C. § 1101(a)(42). Instead, the crux of the CAM program is its use of the parole authority—an authority only available on a case-by-case basis for urgent humanitarian reasons or for significant public benefit—to allow the very same individuals who did not qualify as refugees to come into the United States. A result that is entirely inconsistent with the law.

7.     To the extent that it provides benefits outside of those provided in law by the Refugee Admissions Program, the CAM Program is an unlawful artifice of the Biden Administration's imagination, never authorized by Congress. And to the extent that it facilitates the entry into the United States of illegal aliens' family members based on the mere existence of an application for speculative benefits, it is an

extraordinarily disastrous program to employ in the middle of an unprecedented border crisis.

8.     The CAM Program is illegal. The Biden Administration created it without consideration of the effects it will have on the Plaintiff States and the continuing crisis along the Southwest Border. The Administration created it without notice-and-comment rulemaking. And it imposes substantial, irreparable harms on the Plaintiff States.

9.     This Court should declare unlawful and enjoin the Biden Administration's unlawful program.

PARTIES

A. **Plaintiffs.**

10.     Plaintiff State of Texas is a sovereign State, subject only to the Constitution of the United States. Texas sues to vindicate its sovereign, proprietary, and *parens patriae* interests. The Defendants' operation of the CAM Program injures Texas in multiple ways.

11.     First, Texas spends significant amounts of money providing services to illegal aliens. Those services include education services and healthcare, as well as many other social services broadly available in Texas. Federal law requires Texas to include illegal aliens in some of these programs. Paroling CAM beneficiaries into Texas will injure Texas by increasing the number of illegal aliens receiving such services at its expense.

12.     Second, the State funds multiple healthcare programs that cover illegal aliens. Providing these services, which illegal aliens use, results in millions of dollars of expenditures per year. These services include the Emergency Medicaid program, the Texas Family Violence Program, and the Texas Children's Health Insurance Program.

13.     The Emergency Medicaid program provides health coverage for low-income children, families, seniors, and the disabled. Federal law requires Texas to include illegal aliens in its Emergency Medicaid program. The program costs Texas tens of millions of dollars annually.

14.     The Texas Family Violence Program provides emergency shelter and supportive services to victims and their children in Texas. Texas spends more than a million dollars per year on the Texas Family Violence Program, which includes services for illegal aliens.

15.     The Texas's Children's Health Insurance Program offers low-cost health coverage for children from birth through age 18. Texas spends tens of millions of dollars each year on CHIP expenditures, which includes expenditures for illegal aliens.

16.     Texas faces the costs of uncompensated care provided by state public hospital districts to illegal aliens which results in expenditures of hundreds of millions of dollars per year.

17.     Aliens and the children of those aliens receive education benefits from the State at significant taxpayer expense. The Defendants' facilitation of the entry of

minor aliens into Texas through the CAM program thus increases education expenditures by the State of Texas each year

18.     Third, allowing CAM beneficiaries to be paroled into Texas will cause it to "incur significant costs in issuing driver's licenses." *Texas v. United States*, 809 F.3d 134, 155 (5th Cir. 2015). Texas law subsidizes driver's licenses, including for aliens who have "documentation issued by the appropriate United States agency that authorizes [them] to be in the United States." *Id.* (quoting Tex. Transp. Code § 521.142(a)). Aliens paroled in the United States are eligible for subsidized driver's licenses.[1] By increasing the number of aliens who can secure subsidized licenses, the Defendants impose significant financial harm on Texas. *See Texas*, 809 F.3d at 155.

19.     Plaintiff State of Alabama is a sovereign State, subject only to the Constitution of the United States. Alabama sues to vindicate its sovereign, proprietary, and *parens patriae* interests. The Defendants' operation of the CAM Program injures Alabama in multiple ways. Illegal immigrants in the State receive numerous state services, including healthcare, education, drivers-license, and criminal justice-related services, among others. Paroling CAM beneficiaries into Alabama will injure the State by increasing the number of illegal aliens receiving such services at its expense. Thus, the operation of the CAM Program will inflict harm upon Alabama and its tax-paying citizens.

20.     Plaintiff State of Alaska is a sovereign State, subject only to the Constitution of the United States. Alaska sues to vindicate its sovereign, proprietary,

---

[1] Tex. Dept. of Pub. Safety, *Verifying Lawful Presence* 4 (Rev. 7-13), https://bit.ly/32cdfry   (listing "Parolees" as eligible for driver's licenses).

and *parens patriae* interests. Upon information and belief, the Defendants' operation of the CAM Program injures Alaska in multiple ways. Despite Alaska's distance from the lower forty-eight contiguous states, Alaska has thousands of illegal immigrants in the State that receive state services. Paroling CAM beneficiaries into Alaska will injure Alaska by increasing the number of illegal aliens receiving such services at its expense. For example, Alaska spends a "Base Student Allocation" of an average of $5,930 per adjusted average daily membership (adjusted student count) per year on public school education, regardless of immigration status. On information and belief, as of 2016, the population of illegal immigrants was estimated at around 5,000, which comprised 13 percent of the immigrant population in the State. The operation of the CAM Program will inflict harm upon the State and its tax-paying citizens.

21.     Plaintiff State of Arizona is a sovereign State, subject only to the Constitution of the United States. Arizona sues to vindicate its sovereign, proprietary, and *parens patriae* interests. The presence of unauthorized aliens in the State of Arizona violates its quasi-sovereign interest in its territory and the welfare of its citizens and causes Arizona to incur millions of dollars of costs every year. As a border state, the costs to Arizona are particularly severe. Arizona's state prison system alone spends millions of dollars per year incarcerating unlawfully present aliens who commit crimes in the State. Arizona spends an average of almost $10,000 per student each year on public school education, which it provides regardless of immigration status. Arizona also pays the cost of emergency medical services for the

uninsured, including for aliens not lawfully present in the United States. Increased numbers of aliens will result in further increases in costs to the State."

22.    Plaintiff State of Arkansas is a sovereign State, subject only to the Constitution of the United States. Arkansas sues to vindicate its sovereign, proprietary, and *parens patriae* interests. The Defendants' operation of the CAM Program injures Arkansas in multiple ways. Illegal immigrants in the State receive numerous state services. Paroling CAM beneficiaries into Arkansas will injure the State by increasing the number of illegal aliens receiving such services at the taxpayers' expense. Thus, the operation of the CAM Program will inflict harm upon Arkansas and its tax-paying citizens.

23.    Plaintiff State of Florida is a sovereign State, subject only to the Constitution of the United States. Florida sues to vindicate its sovereign, proprietary, and *parens patriae* interests. The presence of illegal aliens in the State of Florida violates its quasi-sovereign interest in its territory and the welfare of its citizens and causes Florida to incur millions of dollars of costs every year. Florida's state prison system alone spends over $100 million per year incarcerating unlawfully present aliens who commit crimes in the State. Florida spends an average of almost $8,000 per student each year on public school education, which it provides regardless of immigration status.[2] Florida's Department of Children and Families provides a variety of public services to unlawful aliens at the State's expense, including

---

[2] Fla. Dept. of Ed., *Every Student Succeeds Act, 2019-20 Per-pupil Expenditures – District and State*, https://bit.ly/3G0Z8Dr (last accessed Jan. 27, 2022). .

providing shelter to victims of domestic violence, providing care to neglected children, and providing substance abuse and mental health treatment. Finally, Florida frequently pays the cost of emergency medical services for the uninsured. Increased presence of illegal aliens will undoubtedly increase financial costs incurred by Florida.

24.     Plaintiff State of Idaho is a sovereign State, subject only to the Constitution of the United States. Idaho sues to vindicate its sovereign, proprietary, and *parens patriae* interests. The Defendants' operation of the CAM Program injures Idaho in multiple ways. Illegal immigrants in the State receive numerous state services, including healthcare, education, drivers-license, and criminal justice-related services, among others. Paroling CAM beneficiaries into Idaho will injure the State by increasing the number of illegal aliens receiving such services at its expense. Thus, the operation of the CAM Program will inflict harm upon Idaho and its tax-paying citizens.

25.     Plaintiff State of Indiana is a sovereign State, subject only to the Constitution of the United States. Indiana sues to vindicate its sovereign, proprietary, and *parens patriae* interests. The Defendants' operation of the CAM Program injures Indiana in multiple ways. Upon information and belief, the Defendants' operation of the CAM Program injures Indiana by increasing the amounts of money the state is spending on a number of services, including healthcare and education services. Paroled members of the CAM Program would be eligible for Medicaid and the Indiana Children's Health Insurance Program. Paroled children in

the CAM Program would enroll in schools in Indiana where additional funds will be expended to ensure the children are learning English and not falling behind in their studies.

26.     Plaintiff Commonwealth of Kentucky is a sovereign State of the United States of America. Kentucky sues to vindicate its sovereign, proprietary, and *parens patriae* interests. The Defendants' operation of the CAM Program injures Kentucky in multiple ways. Illegal aliens in the State receive numerous state services, including healthcare, education, drivers-license, and criminal justice-related services, among others. Paroling CAM beneficiaries into Kentucky will injure the State by increasing the number of illegal aliens receiving such services at its expense. Thus, the operation of the CAM Program will inflict harm upon Kentucky and its tax-paying citizens.

27.     Plaintiff State of Louisiana is a sovereign State, subject only to the Constitution of the United States. Louisiana sues to vindicate its sovereign, proprietary, and *parens patriae* interests. The Defendants' operation of the CAM Program injures Louisiana in multiple ways. Illegal aliens in the State receive numerous state services. For example, Louisiana must incur the expense of providing a free public education to any school age child admitted through CAM—a cost of approximately $11,000 per year per child. Paroling CAM beneficiaries into Louisiana will injure the State by increasing the number of illegal aliens receiving such services at the taxpayers' expense.

28.     In fact, Defendant Department of Homeland Security ("DHS") has admitted that Louisiana, like other States and municipalities, is directly and

12

concretely affected by changes to DHS rules and policies that have the effect of easing, relaxing, or limiting immigration enforcement. DHS further admitted that such changes can negatively impact Louisiana's law enforcement, housing, medical, education, employment, commerce, and healthcare needs and budgets, as well as its other important health, safety, and pecuniary interests.

29.     Furthermore, Defendant DHS specifically admitted that relaxation of the standards for granting relief from return or removal, such as asylum, an increase in releases from detention, a relaxation of the standards for granting release from detention, changes to immigration benefits or eligibility, and rules, policies, and procedures that could result in significant increases to the number of people residing in a community result in direct and concrete injury to Louisiana. DHS specifically admitted that such injuries include increasing the rate of crime, consumption of public benefits and services, strain upon the healthcare system, harm to the environment, and increased economic competition with Louisiana's current residents for, among other things, employment, housing, goods, and services.

30.     Plaintiff State of Missouri is a sovereign State, subject only to the Constitution of the United States. Missouri sues to vindicate its sovereign, proprietary, and *parens patriae* interests. The Defendants' operation of the CAM Program injures Missouri in multiple ways. Illegal immigrants in the State receive numerous state services, including healthcare, education, drivers-license, and criminal justice-related services, among others. Paroling CAM beneficiaries into Missouri will injure the State by increasing the number of illegal aliens receiving

13

such services at its expense. Thus, the operation of the CAM Program will inflict harm upon Missouri and its tax-paying citizens.

31.     Plaintiff State of Montana is a sovereign State, subject only to the Constitution of the United States. Montana sues to vindicate its sovereign, proprietary, and *parens patriae* interests. The Defendants' operation of the CAM Program injures Montana in multiple ways. Illegal immigrants in the State receive numerous state services. Paroling CAM beneficiaries into Montana will injure Montana by increasing the number of illegal aliens receiving such services at its expense. A 2018 study estimated that approximately 3,000 illegal aliens currently reside in Montana.  Migration Policy Institute, *Profile of the Unauthorized Population (MT)*, https://bit.ly./3r5Pz1w.  A 2016 study estimated the number to be around 5,000. *See U.S. unauthorized immigrant population estimates by state*, Pew Research Center (2016), https://pewrsr.ch/3G9ce1c. A 2017 study estimated the annual cost per illegal alien to Montana taxpayers is $4,802.  Federation for American Immigration Reform, *The Fiscal Burden of Illegal Immigration* 34 (2017), https://bit.ly/34e9DWC. Thus, the operation of the CAM Program will inflict harm upon Montana and its tax-paying citizens.

32.     Plaintiff State of Oklahoma is a sovereign State, subject only to the Constitution of the United States. Oklahoma sues to vindicate its sovereign, proprietary, and *parens patriae* interests. The Defendants' operation of the CAM program injures Oklahoma's interests in its territory and the welfare of its citizens and causes Oklahoma to incur millions of dollars of costs every year. Oklahoma sits

close to the southern border of the United States and sits on the Interstate 35 and Interstate 44 corridors, which serve as major arteries for the illegal immigration that CAM encourages and for related illegal drug traffic. As a result, the state's agencies are often tasked with resolving the problems created by the CAM program and incurring additional costs. For example, Oklahoma penitentiaries currently house prisoners not lawfully present in the United States who have committed crimes, at cost to Oklahoma of over $20,000 per year per prisoner. Oklahoma must incur the expense of providing a free public education to any school age child admitted through CAM—a cost of approximately $9,000 per year per child. Oklahoma also incurs significant costs for health care and other state services that are broadly available in the state, including to illegal aliens. Increasing the presence of aliens through the CAM program and its parole process will impose financial harm on Oklahoma.

33.    Plaintiff State of South Carolina is a sovereign State, subject only to the Constitution of the United States. South Carolina sues to vindicate its sovereign, proprietary, and *parens patriae* interests. The Defendants' operation of the CAM Program injures South Carolina in multiple ways, including pecuniary injuries and injuries to its quasi-sovereign interest in its territory. With respect to pecuniary injuries, the State of South Carolina expends significant state resources on providing state services to Illegal aliens in the State. As one example, the State spends thousands of dollars per student each year on public school education, which the State provides to students regardless of their immigration status. Paroling CAM beneficiaries into South Carolina will injure the State by increasing the number of

15

illegal aliens receiving such services at the taxpayers' expense. Thus, the operation of the CAM Program will inflict harm upon South Carolina and its tax-paying citizens.

34.   Plaintiff State of Utah is a sovereign State, subject only to the Constitution of the United States. Utah sues to vindicate its sovereign, proprietary, and *parens patriae* interests. The Defendants' operation of the CAM Program injures Utah in multiple ways. Illegal immigrants in the State receive numerous state services, including healthcare, education, drivers-license, and criminal justice-related services, among others. Paroling CAM beneficiaries into Utah will injure the State by increasing the number of illegal aliens receiving such services at its expense. Thus, the operation of the CAM Program will inflict harm upon Utah and its tax-paying citizens.

**B. Defendants.**

35.   Defendant Joseph R. Biden, Jr., is the President of the United States. He is sued in his official capacity.

36.   Defendant United States of America is the federal sovereign.

37.   Defendant Antony J. Blinken is the United States' Secretary of State. He is sued in his official capacity only.

38.   Defendant U.S. Department of State ("DOS") oversees and administers portions of the refugee resettlement program through Defendant, the Bureau of Population, Refugee, and Migration ("PRM"), and administers the Resettlement Support Centers ("RSC") in El Salvador, Guatemala, and Honduras.

39.     Defendant Nancy Izzo Jackson is the Senior Bureau Official at PRM. She is sued in her official capacity only.

40.     Defendant Alejandro Mayorkas is the U.S. Secretary of Homeland Security. He is sued in his official capacity only.

41.     Defendant U.S. Department of Homeland Security ("DHS") oversees Defendant U.S. Citizenship and Immigration Services ("USCIS") as a constituent agency of DHS. DHS and its constituent agencies administer the Immigration and Nationality Act ("INA").

42.     Defendant Ur Jaddou is the Director of USCIS. He is sued in his official capacity only.

## JURISDICTION AND VENUE

43.     The Court has jurisdiction over this dispute because it arises under the Constitution and laws of the United States. *See* 28 U.S.C. §§ 1331, 1346, 1361; 5 U.S.C. §§ 702–703. It has jurisdiction under 5 U.S.C. §§ 705–706 and 28 U.S.C. §§ 1361 and §§ 2201–2202 to render the declaratory and injunctive relief that the Plaintiff States request. The Plaintiff States' claims are not subject to the INA's denial of jurisdiction for claims on behalf of an alien, 8 U.S.C. § 1252(g), because it is bringing this suit for the benefit of itself and its citizens.

44.     This district is a proper venue because the State of Texas resides here and a substantial part of the events or omissions giving rise to Texas's claims occurred here. 28 U.S.C. § 1391(e).

FACTS

**A.     The Refugee Admissions Program and the Parole Authority**

45.     Congress, through the INA, provides a fulsome statutory scheme to address matters related to immigration, refugees, and the government's parole authority.

46.     Specifically, the INA defines the term "refugee," and enumerates the mechanism for granting refugee status. *See* 8 U.S.C § 1157 *et seq*. The INA defines as a refugee:

> [A]ny person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A). The INA also provides limited authority to consider the admission of a refugee who is *within* their home country—but the underlying requirements still apply (persecution on account of race, religion, nationality, membership in a particular social group, or political opinion). *Id.* at § 1101(a)(42)(B). Importantly, the INA does not provide any authority to categorically admit individuals into the United States who do not qualify as refugees under the law, but who otherwise present sympathetic circumstances.

47.     As established by Congress by statute, the Refugee Admissions Program involves a careful consultation process between the President and the Congress— whereby the President proposes an annual cap on the number of refugees who can be

18

admitted in a given fiscal year, consults with Congress on that number, and then carries on duties related to an admission of a number of refugees no higher than that number. 8 U.S.C. §§ 1157(a)(2), (d).

48.    Separately, the INA provides the specific instances where the government may use its authority to parole individuals into the United States who otherwise would not be lawfully permitted to enter. *See* 8 U.S.C. § 1182(d)(5). Specifically, Congress has directed that parole may only be granted on a case-by-case basis, and even then, only for "urgent humanitarian reasons or significant public benefit." *Id.* at § 1182(d)(5)(A). *See also Texas v. Biden*, 20 F.4th 928, 947 (5th Cir. 2021).

49.    Congress added those restrictions—the case-by-case basis for urgent humanitarian reasons or significant public benefit—to the parole power in 1996, because:

> The text of section 212(d)(5) is clear that the parole authority was intended to be used on a case-by-case basis to meet specific needs, and *not as a supplement to Congressionally-established immigration policy. In recent years, however, parole has been used increasingly to admit entire categories of aliens who do not qualify for admission under any other category in immigration law, with the intent that they will remain permanently in the United States.* This contravenes the intent of section 212(d)(5), but also illustrates why further, specific limitations on the Attorney General's discretion are necessary.

H.R. Rep. No. 104-469, at 140 (1996) (emphasis added).

50.    Congress emphasized that DHS "may not parole into the United States an alien who is a refugee unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the

alien be paroled into the United States rather than be admitted as a refugee[.]" 8 U.S.C. § 1182(d)(5)(B). *See also Texas v. Biden*, 20 F.4ᵗʰ at 994.

51.    As the U.S. Court of Appeals for the Fifth Circuit recently noted, "[q]uintessential modern uses of the parole power include, for example, paroling aliens who do not qualify for an admission category but have an urgent need for medical care in the United States and paroling aliens who qualify for a visa but are waiting for it to become available." *Id.* at *6.

## B.    The Obama Administration Creates the First Central American Minors Program in 2014.

52.    Following three years of increasing apprehensions of minors along the southwest border—roughly 24,000 in FY2012, 39,000 in FY2013, and 69,000 in FY2014[3]—the Obama Administration unveiled the Central American Minors Program in the 2014 Report to Congress on the Proposed Refugee Admissions for Fiscal Year 2015. U.S. Dep't of State, Proposed Refugee Admissions for Fiscal Year 2015 at iii-iv (Sept. 14, 2014), https://bit.ly/3mnxZUd. The report stated that the Obama Administration "planned establishment of in-country refugee programs for minors in Honduras, El Salvador, and Guatemala." *Id.* Noting the exponential rise in the number of unaccompanied alien children crossing the southwest border, the stated purpose of the program was "to reduce unlawful and dangerous migration to the United States[.]" *Id.* In other words, the Obama Administration created the

---

[3] These numbers reflect only encounters by U.S. Border Patrol accessed at https://bit.ly/3qjEtVo.

program as a mechanism to *decrease* the number of unaccompanied alien children crossing the southwest border.

53.    On or about November 14, 2014, DOS and DHS issued a joint press release announcing a two-prong program and providing details on eligibility in a fact sheet. Bureau of Population, Refugees, and Migration, U.S. Dep't. of State, In-Country Refugee/Parole Program for Minors in El Salvador, Guatemala, and Honduras with Parents Lawfully Present in the United States (Nov. 14, 2014), https://bit.ly/3yJBgC8. At no time did DOS or DHS issue a notice of proposed rulemaking or otherwise provide an opportunity for meaningful notice and comment, or any alternative means of stakeholder input, prior to the November 2014 statement.

54.    The first prong, known as the CAM Refugee Program, permitted nationals of El Salvador, Guatemala, and Honduras to apply for their children to be screened for refugee status eligibility in their country of nationality. *Id*.

55.    To qualify, the parent in the United States had to be at least eighteen (18) years of age and must be within certain immigration statuses. Specifically, the qualifying parent was required to be either a lawful permanent resident or a recipient of temporary protected status, parole, deferred action, Deferred Enforced Departure, or withholding of removal. *Id*.

56.    The qualifying child had to be the biological, step, or legally adopted child of the qualifying parent, under twenty-one (21) years of age, unmarried, and a national of El Salvador, Guatemala, or Honduras. *Id*.

57.     While billed as a program for children to relocate to the United States to join their parents, applications remained low.

58.     The Obama Administration subsequently expanded the program to deem certain adults were eligible under CAM, including an in-country parent of the qualifying child, either married to the qualifying parent or not. U.S. Dep't of State, Expansion of the Central American Minors (CAM) Program (Nov. 15, 2016), https://bit.ly/3mlVJIe.

59.     Through the program, qualifying parents would file Form DS-7699, Affidavit of Relationship (AOR) for Minors Who Are Nationals of El Salvador, Guatemala, and Honduras. DOS would review the affidavits and those provided access to the program would begin with data collection at an RSC and ultimately a refugee eligibility interview by a USCIS officer specifically trained to determine eligibility pursuant to the definition of a refugee

60.     The second prong, the CAM Parole Program, afforded any alien found ineligible for refugee status an opportunity to be automatically considered for significant interest parole into the United States.

61.     By December 2016, filings totaled 9,916 affidavits in various stages of the CAM process. The program saw an approximate 25% approval rate for the CAM Refugee Program and a far larger number approved under the CAM Parole Program. U.S. Citizenship and Immigration Serv. Ombudsman, Recommendation on the Central American Minors (CAM) Refugee/Parole Program (Dec. 21, 2016), https://bit.ly/3ecnTB8. Specifically, the former USCIS Ombudsman noted that "the

22

majority of CAM applicants are granted parole rather than refugee status after a USCIS interview. *Id.* at 25. And as noted by one district court years later, "[f]om its inception, the CAM Program granted parole broadly. Throughout its operation, the Program approved approximately 99% of beneficiaries who were interviewed and considered for parole." *S.A. v. Trump*, 363 F. Supp. 3d 1048, 1078 (N.D. Cal. 2018).

62.    While filings remained low, nearly 40,000 unaccompanied alien children were apprehended along the southwest border in Fiscal Year 2015 and an additional approximate 59,700 were apprehended in Fiscal Year 2016, *see* United States Border Patrol, *Total Unaccompanied Alien Children Apprehensions by* Month, https://bit.ly/3qjEtVo—the opposite result of its goal of "reduc[ing] unlawful and dangerous migration to the United States."  U.S. Dep't of State, Proposed Refugee Admissions for Fiscal Year 2015 at iii-iv (Sept. 14, 2014), https://bit.ly/3mnxZUd.

## C.    The Trump Administration Terminates the CAM Program.

63.    On January 25, 2017, President Trump issued Executive Order 13767, directing the Secretary of DHS to "take appropriate action to ensure that parole authority under section 212(d)(5) of the INA…is exercised only on a case-by-case-basis in accordance with the plain language of the statute[.]" Exec. Order No. 13767, 82 Fed. Reg. 8793 (Jan. 30, 2017).

64.    DHS subsequently conducted a review of the program pursuant to the Executive Order. As part of that review:

> DHS found that as of July 13, 2017, the CAM Program had approved
> 99% of the beneficiaries who had been interviewed as refugees or
> recommended them for parole (30% as refugees, 69% for parole) and that
> only 1% had been denied both refugee status and parole. DHS's review

determined that "the CAM Parole program provided parole very broadly and not in accordance with the statu[t]e and the President's Executive Order."

*S.A. v. Trump*, 363 F. Supp. 3d 1048, 1079 (N.D. Cal. 2018).

65.     The Trump Administration subsequently terminated the entire CAM Program, phasing out the CAM Parole Program and then the CAM Refugee Program.

66.     On August 16, 2017, DHS published a Notice in the Federal Register announcing the termination of the CAM Parole Program. Termination of the Central American Minors Parole Program, 82 Fed. Reg. 38926 (Aug. 16, 2017). In rescinding the program, DHS noted by way of background, that "[i]n general, under current immigration laws, only lawful permanent residents and U.S. citizens can file family-based immigrant visa petitions. Therefore, many of the qualifying parents under the [CAM Program] are unable to file an immigrant petition for their in-country relatives." *Id*. DHS described the automatic consideration of parole for applicants who were denied refugee status, and then announced that it would no longer consider or authorize any parole requests and rescinded the approval of any alien who was conditionally approved but who had not yet traveled to the United States. *Id*.

67.     On November 8, 2017, DOS ended the CAM Refugee Program by announcing that it would no longer accept any new applications effective the following day. U.S. Dep't of State, Status of the Central American Minors Program (Nov. 8, 2017), https://bit.ly/32dMeEa.

24

**D.    The Biden Administration Reinstates the CAM Program**

68.    On March 10, 2021, DHS and DOS announced the reinstatement of the CAM Program in two phases: (1) identifying and reopening all cases previously filed and suspended prior to the 2017 terminations, and (2) expanding the program and accepting new applications. U.S. Dep't of State, *Restarting the Central American Minors Program* (Mar. 10, 2021), https://bit.ly/32o9gYs.

69.    Under the reinstated program and following verification that the qualifying parent was still eligible and wished to proceed, DOS would work to contact qualifying children in El Salvador, Guatemala, and Honduras and resume processing. *Id.*

70.    DOS and DHS did not publish a notice of proposed rulemaking nor provide any alternative notice in the Federal Register prior to or following the March 10 press release.

71.    On June 15, 2021, DOS and DHS issued a second joint statement announcing the commencement of phase two of the reopening. Specifically, this phase was intended to "expand access to the program to a greater number of qualifying individuals."  U.S. Dep't of Homeland Sec. and U.S. Dep't of State, *Joint Statement by the U.S. Department of Homeland Security and the U.S. Department of State on the Expansion of Access to the Central American Minors Program* (June 15, 2021), https://bit.ly/30KASqp.

72.    DOS and DHS announced that access to the CAM Program would now be authorized for parents or legal guardians who do not have status in the United

States, but instead have a pending asylum application or a pending U-visa petition filed before May 21, 2021. *Id.*

73.     On September 13, 2021, the Defendants announced that applications for the CAM Program would be accepted beginning on September 14. *See* U.S. Department of State, *Joint Department of State and Department of Homeland Security Rollout of the Application Process for the Central American Minors (CAM) Program*, (Sept. 13, 2021), https://bit.ly/3qjFBs6.

74.     The Defendants still have not issued a notice of proposed rulemaking nor have the Defendants provided any reasoned explanation as to why an exemption to notice-and-comment rulemaking would apply in the instant case.

75.     Instead, the reinstituted CAM Program "usurps the power of Congress to dictate a national scheme of immigration laws and is contrary to the INA," and interprets statutes where no ambiguity lies. *See* Memorandum and Order at 33, *Texas v. U.S.*, No. 1:18-CV-00068 (S.D. Tex. Jul. 16, 2021).

76.     These announcements are more than a general statement of departmental policy as they create rights for certain aliens (by expanding the universe of those granted parole), and obligations (through required expenditures by States, including the Plaintiff States, on healthcare, public education, and driver's licenses. *See id.* at 19 (citing *Pros. & Patients for Customized Case v. Shalala*, 56 F. 3d 592, 595 (5th Cir. 1995)).

77.     Moreover, because the previous iteration of the CAM Program resulted in the approval of 99% of all applications—and considering the expanded categories

of qualifying relatives announced by the Biden Administration—it is all but certain that the current iteration of the CAM Program will have a similar approval rate.

E.      **Irreparable Harms to the Plaintiff States**

78.     As the unlawful population of the Plaintiff States continues to grow, the strain on the Plaintiff States' resources and the ability to provide essential services such as emergency medical care, education, driver's licenses, and other public safety services will rapidly decline. Additionally, all services will come at a higher cost.

79.     While the Plaintiff States may have been able to estimate the population of qualifying parents when eligibility required lawful status, the expanded population is immeasurable. Border apprehensions have increased exponentially since February 1, 2021. *See* U.S. Customs and Border Protection, *Southwest Border Land Encounters*, https://bit.ly/30Nd0ma (last visited Jan. 27, 2022).

80.     There is simply no accurate method to measure the number of aliens in the Plaintiff States without lawful status. Even if the Plaintiff States could estimate that population, it would then have to accurately estimate the number of qualifying family members in the Northern Triangle to truly calculate the total potential costs imposed on the Plaintiff States from the CAM Program.

81.     As an example, as the Plaintiff States use individual school district projections to make formula funding choices, a sudden influx of students not previously accounted for, would increase education costs above what would have otherwise been expended. This would cause a disparity in funding which would have

dire consequences on each school district's resources and its ability to provide proper levels of education to students.

82.     The Plaintiff States must account for anticipated expenditures in providing other social services including health care and driver's licenses and will be unable to do so through its budget if it cannot accurately approximate the amount of funds expended in providing these services to the qualifying children as they enter.

83.     This affects the Plaintiff States' quasi-sovereign interests in their territory and their ability to properly carry out such interests on behalf of the citizens of the State.

84.     The population boom that comes with expanded criteria and a *de facto* categorical parole program will irreparably harm the Plaintiff States.

CLAIMS FOR RELIEF

**A.     Agency Action Not in Accordance with Law.**

85.     The APA prohibits agency actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A).

86.     Congress has explicitly prescribed the process for immigration, refugee admissions, and parole in the INA. The CAM Program—to the extent that it uses parole and operates outside of the Refugee Admissions Program—constitutes agency action not in accordance with law: it violates the limited authority given to the executive department to parole individuals for urgent humanitarian reasons or for significant public benefit only, which is to be determined on a case-by-case basis. 8 U.S.C. § 1182(d)(5)(A).

87.     The INA does not explicitly or implicitly create any authority in the executive branch that includes the ability to create an entire program that *categorically* considers applicants for benefits as applicants for parole. Congress does not "hide elephants in mouseholes" of this nature. *See Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457, 468 (2001); *Banks v. Booth,* 3 F.4th 445, 449 (D.C. Cir. 2021). If it did, there would be no limit on the number of aliens who could be brought into the United States. Any administration could circumvent all caps set on immigration levels by simply determining general categories that constitute a "significant public benefit" or a "urgent humanitarian reason," reviewing an application from each applicant, and paroling all applicants because the administration desires such a result. Such a result is directly contrary to the plain text and legislative history of the parole statute.

88.     The Defendants' implementation of CAM constitutes an unnecessary and *ultra vires* action in flagrant disregard of express and congressional authorization.

**B.    Arbitrary and Capricious Agency Action.**

89.     The APA prohibits agency actions that are "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). Additionally, a rule that fails to include stated reasoning is arbitrary and capricious. *Action on Smoking & Health v. CAB,* 699 F.2d 1209, 1219 (D.C. Cir. 1983).

1.      **Lack of Reasoned Decision-Making.**

90.     The March 10 and June 15 announcements fail to provide a reasoned explanation for resuming the CAM Program.

91.     The announcements merely rely on the same statement that the Obama Administration used when CAM initially began in 2014. Specifically, it states that the program "provides a safe, legal, and orderly alternative to the risks incurred in the attempt to migrate to the United States irregularly" while remaining silent regarding its legality or basis in law.

92.     Moreover, this explanation provides no insight on the issues and facts and could not be considered to reasonably provide any interested parties with sufficient insight on the subject matter. *American Iron & Steel Institute v. EPA*, 568 F.2d 284, 293 (3d Cir. 1977).

93.     Additionally, the Defendants failed to assess the costs of the intended action and to base the decision on "reasonably obtainable scientific, technical, economic" data "concerning the need for, and consequences of" the rule. Exec. Order No. 12866, 58 Fed. Reg. 51735 (Oct. 4, 1993), as amended.

94.     In the instant case, the Defendants failed to present any evidence that they considered the economic cost or consequences of their actions. The Defendants' announcements were geared solely to the benefit of the aliens eligible for the program with nothing to address the undue burden that such increase in population may carry for Plaintiff States or any other interested party.

95.     Without reasoned analysis and without adhering to the requirements of longstanding executive orders, the announcements to restart and expand the CAM Program constitute arbitrary and capricious agency action.

### 2.     Failure to Consider Alternative Approaches.

96.     In designing the CAM program and announcing it via press release, the Defendants failed to consider alternative approaches to managing illegal immigration. A DHS action is arbitrary and capricious if it is issued "without any consideration whatsoever of a [more limited] policy." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1912 (2020) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51 (1983)).

97.     The March 10 and June 15 announcements categorically resume a refugee and parole program without considering any other approach that may prove less burdensome on the Plaintiff States.

98.     By omitting any analysis in the announcements, the Defendants "failed to consider important aspects of the problem" that it was attempting to resolve. *Id.* at 1910 (alterations and citations omitted).

### 3.     Failure to Consider State Reliance Interests.

99.     Even if the Defendants had considered the costs and benefits to the United States from the implementation of the CAM Program during a time of unprecedented insecurity at the border, the Defendants had an obligation to consider the costs that the Plaintiff States would bear from the implementation of CAM. They transparently failed to do so, having made their decision without seeking input,

31

whether directly or through a notice and comment period, from any of the Plaintiff States. They flatly ignored the harms that would fall on the Plaintiff States, which "bear[]" many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397 (2012). The Defendant's failure to consider such costs was arbitrary and capricious.

100.   As stated above, the Plaintiff States particularly experience increased costs associated with illegal immigration—which the CAM Program encourages—and with the provision of services to would-be beneficiaries of the CAM Program. The Defendants particularly failed to consider whether "there was 'legitimate reliance' on the" prior administration's cessation of the CAM Program as an indispensable tool to address the migration crisis by diminishing incentives for illegal immigration and enabling DHS to better focus its resources on legitimate asylum claims. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020) ("When an agency changes course . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.") (cleaned up). Certainly, none of the Defendants' press releases analyzed those costs or the Plaintiff States reliance interest. This, too, was arbitrary and capricious.

## C.   Lack of Notice-and-Comment Rulemaking.

101.   The Defendants failed to conduct the required notice and comment process prior to restarting the CAM Program, pursuant to the Administrative Procedures Act ("APA").

102.    The APA defines "rule" as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy[.]" 5 U.S.C. §551(4).

103.    Further, the APA requires agencies issuing rules to conduct notice-and-comment rulemaking. 5 U.S.C. §553.

104.    The announcements resuming the CAM Program constitute a substantive rulemaking within the APA's definition, and no exceptions to notice-and-comment rulemaking were invoked nor are any exceptions available. They create affirmative rights and obligations and are binding on the government without discretion.

105.    The two announcements created both rights and obligations under the law and confers immigration benefits on eligible aliens. *Texas v. U.S.*, 809 F.3d 134, 171 (5th Cir. 2015) (quoting *Gen. Elec. Co. v.* EPA, 290 F.3d 377, 383 (D.C. Cir. 2002)); Memorandum and Order at 19-22, *Texas v. U.S.*, No. 1:18-CV-00068 (S.D. Tex. Jul. 16, 2021) (citing *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905-06) (2020)). Additionally, the announcements took immediate effect allowing any eligible alien present in the United States to derive a substantive benefit. *Id*. at 22 (citing *Shalala*, F.3d at 595)).

106.    Additionally, these announcements imposed obligations on the federal government to automatically adjudicate requests for parole without requiring an application for parole and in contravention of statute.

107.   While the announcements purport to provide discretion in adjudicating parole requests, it is apparent from its application on the government that it is meant to be binding. Memorandum and Order at 37, *Texas v. U.S.,* No. 1:18-CV-00068 (S.D. Tex. Jul. 16, 2021) (citing *Texas v. U.S.*, 809 F.3d at 173 (quoting *Gen. Elec.* 290 F.3d at 383). In the instant case, the government is required to automatically review each denied refugee referral for parole as a matter of "discretion." This is inconsistent with the letter and spirit of the statute and is at odds with the requirement that parole be granted only in limited circumstances.

108.   That applicants for parole under CAM do not need to file a stand-alone application for parole suggests that it is not discretionary to consider these requests and, instead, forms the basis for a categorical parole program. This, on its face, removes any true discretion from the government and constitutes a substantive rule.

**D.    Failure to Take Care that the Laws be Faithfully Executed.**

109.   The Constitution requires that the President, as well as those exercising power on his behalf, "take Care that the Laws be faithfully executed." U.S. CONST. art. II § 3; *see also* U.S. CONST. art. II, § 1, cl. 1 (vesting "[t]he executive Power" in the President).

110.   The March 10 and June 15 announcements are unconstitutional because they direct executive officers to refrain from enforcing federal immigration law. The INA states that parole may be considered "*only* on a case-by-case basis for urgent humanitarian reasons or significant public benefit." INA §212(d)(5)(A) (emphasis added). While on its face, the parole program is predicated on case-by-case

determination, the automation of the program, without need to apply separately for parole, makes it a *de facto* categorical parole program.

111.    Additionally, the Defendants failed to articulate how paroling these aliens into the United States, after they are found ineligible for refugee status, constitutes either an urgent humanitarian reason or a significant public benefit to the United States, as mandated in the statutorily prescribed case-by-case analysis.

112.    Directing USCIS to begin adjudicating these parole requests constitutes a government obligation, is contrary to statute, violative of the law, and therefore violates the constitutional duty of faithful execution.

113.    Unconstitutional agency action or inaction violates the APA, *see* 5 U.S.C. § 706, and can be enjoined on that basis. However, violations of the Take Care Clause are actionable independent of the APA, and the Court can enjoin the Defendants' violations of their Take Care obligations under its inherent equitable powers. *See Armstrong v. Exceptional Child Center, Inc.,* 575 U.S. 320, 327-28 (2015) (discussing "a long history of judicial review of illegal executive action, tracing back to England.").

## PRAYER FOR RELIEF

**WHEREFORE,** for these reasons, Plaintiff States asks this Court to enter judgment in their favor and to provide the following relief:

a.  Declare the Central American Minors Program unlawful and set it aside to the extent that it provides any benefits outside of the contours of the Refugee Admissions Program;

b. Enjoin the Defendants' use of the parole authority under the Central American Minors Program;

c. Enjoin the Defendants from carrying out the CAM Program until it engages in rulemaking pursuant to the APA's notice-and-comment rulemaking or pursuant to a lawful exception from those requirements;

d. Award the Plaintiff States their costs and reasonable attorney's fees; and

e. Award such other and further relief as this Court deems equitable and just.

Respectfully submitted,

Dated: March 14, 2022

GENE P. HAMILTON
Virginia Bar No. 80434
Vice-President
  and General Counsel
America First Legal Foundation
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

KEN PAXTON
  *Attorney General of Texas*
BRENT WEBSTER
  *First Assistant Attorney General*
AARON REITZ
  *Deputy Attorney General for Legal Strategy*
RYAN D. WALTERS, TX. BAR NO. 24105085
  *Attorney-in-charge*
  *Special Counsel, Special Litigation*

*/s/ Michelle Ward Ghetti*
MICHELLE W. GHETTI, TX. BAR No. 04342300
  *Special Counsel for Legal Strategy*
Office of the Attorney General
PO Box 12548 (MC 009)
Austin, TX 78711-2548
Tel: (512) 463-4139
Fax: (512) 474-2697
Aaron.Reitz@oag.texas.gov
Ryan.Walters@oag.texas.gov
Michelle.Ghetti@oag.texas.gov
*Counsel for the Plaintiff States*

OTHER COUNSEL:

STEVE MARSHALL
  *Attorney General of Alabama*
Edmund G. LaCour Jr.
  *Solicitor General*
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
[Edmund.LaCour@AlabamaAG.gov](mailto:Edmund.LaCour@AlabamaAG.gov)
*Counsel for the State of Alabama*

TREG R. TAYLOR
  *Attorney General of Alaska*
Cori M. Mills
  *Deputy Attorney General*
Department of Law
P.O. Box 110300
Juneau, AK 99811
Phone: 907-465-3600
Fax: 907-465-2520
*Counsel for the State of Alaska*

MARK BRNOVICH
  *Attorney General of Arizona*
Drew C. Ensign
  *Deputy Solicitor General*
2005 N. Central Ave.
Phoenix, AZ 85004
Phone: (602) 542.5025
Fax: (602) 542.4377
*Counsel for the State of Arizona*

LESLIE RUTLEDGE
  *Attorney General of Arkansas*
Dylan L. Jacobs
  *Deputy Solicitor General*
Office of the Arkansas Attorney
  General
323 Center Street, Suite 200

Little Rock, Arkansas 72201
Tel: (501) 682-2007
Fax: (501) 682-2591
*Counsel for the State of Arkansas*

ASHLEY MOODY
 *Attorney General of Florida*
James H. Percival (FBN 1016188)
 *Deputy Attorney General of Legal*
 *Policy*
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com
*Counsel for the State of Florida*

LAWRENCE G. WASDEN
 *Attorney General of Idaho*
Brian Kane
 *Chief Deputy*
P.O. Box 83720
Boise, ID 83720-0010
Telephone: (208) 334-2400
FAX: (208) 854-8071
Brian.kane@ag.idaho.gov
*Counsel for the State of Idaho*

THEODORE E. ROKITA
 *Attorney General of Indiana*
Betsy M. DeNardi
Cory C. Voight
 *Directors of Complex Litigation*
Indiana Government Center South
302 W. Washington St., 5th Floor
Indianapolis, IN 46204
Betsy.DeNardi@atg.in.gov
Cory.Voight@atg.in.gov
*Counsel for the State of Indiana*

DANIEL CAMERON
  *Attorney General of Kentucky*
Olivia F. Amlung
  *Assistant Attorney General*
Kentucky Office of the Attorney
  General
700 Capital Avenue, Suite 118
Frankfort, Kentucky
Tel: (502) 696-5330
olivia.amlung@ky.gov
*Counsel for the Commonwealth of*
  *Kentucky*

JEFF LANDRY
  *Attorney General of Louisiana*
Elizabeth B. Murrill
  *Solicitor General*
J. Scott St. John
  *Deputy Solicitor General*
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, LA 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov
*Counsel for the State of Louisiana*

ERIC S. SCHMITT
  *Attorney General of Missouri*
John Sauer
  *Solicitor General*
Jesus Osete
  *Deputy Solicitor General and*
  *Deputy Attorney General for Special*
  *Litigation*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
Fax: (573) 751-0774
John.Sauer@ago.mo.gov
Jesus.Osete@ago.mo.gov
*Counsel for the State of Missouri*

AUSTIN KNUDSEN
 *Attorney General of Montana*
Kristin Hansen
 *Lieutenant General*
David M.S. Dewhirst
 *Solicitor General*
Christian B. Corrigan
 *Assistant Solicitor General*
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Phone: 406-444-2026
Fax: 406-444-3549
david.dewhirst@mt.gov
christian.corrigant@mt.gov
*Counsel for the State of Montana*


JOHN M. O'CONNOR
 *Attorney General of Oklahoma*
Bryan Cleveland
 *Deputy Solicitor General*
Office of the Oklahoma Attorney
 General
313 NE 21st St.
Oklahoma City, OK 73105
(405) 521-3921
bryan.cleveland@oag.ok.gov
*Counsel for the State of Oklahoma*


ALAN WILSON
 *Attorney General of South Carolina*
Thomas T. Hydrick
 *Assistant Deputy Solicitor General*
Post Office Box 11549
Columbia, SC 29211
Phone: (803) 734-4127
Email: thomashydrick@scag.gov
*Counsel for the State of South
 Carolina*

SEAN D. REYES
 *Utah Attorney General*
Melissa A. Holyoak
 *Utah Solicitor General*
Office of the Utah Attorney General
350 N. State Street, Suite 230
Salt Lake City, UT 84114
Email: melissaholyoak@agutah.gov
*Counsel for the State of Utah*